Lee YEAGER, Plaintiff,

v.

GENERAL MOTORS CORPORATION, Defendant.

No. 4:98CV2478.

United States District Court, N.D. Ohio, Eastern Division.

June 30, 1999.

---

Robert S. Walker, John Q. Lewis, Jones, Day, Reavis & Pogue, Cleveland, OH, for General Motors Corporation.

## MEMORANDUM OPINION AND ORDER

ECONOMUS, District Judge.

On October 29, 1998, Plaintiff, Lee Yeager, filed the above captioned complaint against General Motors Corporation ("GM") alleging violations of Title VII of the Civil Rights Act and the Fifth Amendment of the United States Constitution for not selecting him for its apprentice program. On April 29, 1999, Plaintiff filed a Supplemental Amended Complaint adding Title VII and Fifth Amendment claims relating to a different GM plant.

Defendant has filed a Motion for Partial Summary Judgment[1] on both of the Fifth Amendment claims and the original Title VII claim. For the following reasons, the Defendant's Motion is **GRANTED**.

## I. FACTS

The following facts are uncontested. GM, pursuant to the collective bargaining agreement between itself and the International Union UAW ("UAW"), recruited individuals into its skilled trades apprentice training positions through jointly adminis-

tered local apprentice programs, including one at the assembly plant and one at the fabrication plant at its Lordstown facility in Warren, Ohio. The apprentice training program relies on recruitment inside and outside any plant in which it is implemented. A local committee composed of GM and UAW representatives creates a list of applicants to undergo the application process. The "Applicant List" is partly composed of 100 non-seniority individuals who are randomly selected from among those showing interest. The committee also uses a special recruitment process to identify strong female and minority candidates who are added to this list without going through the random selection.

After the random selection process, the first step for admission into the apprentice training program consists of application forms where the applicants list the skilled trade groups for which they wish to be considered. Next, the applicants must take a written test that evaluates their general abilities in areas such as mathematics and reading comprehension. Three lists are made of those who score in the top 30% each for minority applicants, women applicants, and white male applicants. The applicants on these lists may submit to an interview for which they receive another score.

Applicants are ranked based on the sum of these scores (their "Total Selection Points"), with the highest possible score being 72. The applicants' Total Selection Points are recorded on lists that are used for future apprentice selections. Separate lists are kept for seniority employees and non-seniority individuals.[2] For every two seniority employees offered apprenticeships, only one non-seniority applicant may

---

1. On December 22, 1998, Defendant filed a Motion for Summary Judgment (Dkt. No. 12) on the claims relating to only one GM plant. Following Plaintiff's Supplemental Amended Complaint, Defendant renewed its motion as a Motion for Partial Summary Judgment (Dkt. No. 45).

2. Non-seniority individuals include GM employees who do not have the necessary time and experience at the plant where they are applying, and persons like Plaintiff, who do not work for GM.

be offered an apprenticeship.[3] These separate lists maintain a record of applicants' scores to determine who is selected when apprentice training positions become available.

However, these rankings are not static. Applicants' positions change under the following three circumstances: (1) as new applicants are tested and added to the list, (2) as applicants are selected for apprenticeships and taken off the list, and (3) on infrequent occasions when certain applicants are allowed to retest. Additionally, GM conducts a Pre–Apprentice Training Program ("PATP") for women and minority applicants whose scores are near the selection range. This program enables those applicants to increase their Total Selection Points by up to seven points.

Plaintiff is a non-seniority white male. He applied to the local apprentice program at the Lordstown Assembly Plant in 1989. He was among the candidates randomly selected for the Applicant List. He first took the apprentice test in 1989 and was interviewed in 1990 for his selected three positions: Truck Repair, Tool Making, and Pipefitting. He attained his highest Total Selection Points, 53, in Truck Repair. In 1991, four seniority positions and only one non-seniority position in Truck Repair became available. The last position was filled by a white male with a score of 68, fifteen points higher than Plaintiff. In 1993, a new apprentice class was selected, but only two seniority and no non-seniority positions opened in Truck Repair, and no one with a score under 56 was selected for any apprenticeship.

In 1996, Plaintiff exercised his option to retake the exam and changed his Truck Repair preference to Millwright. After the new interviews, he had Total Selection Points of 60 in Millwright, 57 in Tool Making, and 55 in Pipefitting. Later that year, GM again sought apprentices for the Lordstown assembly plant to fill a total of fifty positions. There were thirteen seniority and six non-seniority apprenticeships available for Millwright, six seniority and three non-seniority for Pipefitting, and three seniority and one non-seniority for Tool Making. Plaintiff's Total Selection Points made him the 14th ranked non-seniority white male for Millwright, 24th for Pipefitting, and 36th for Tool Making. The preliminary list of the top fifty candidates for the apprentice positions was entirely composed of white males, and Plaintiff was not among them. After affirmative action considerations, 38 white males were accepted into the apprentice program. Women and minorities were selected who had scores lower than Plaintiff's before affirmative action considerations.[4]

In 1997, Plaintiff applied to also be considered for the apprentice training program at the Lordstown fabrication plant, which is a separate plant with a separate program from that at the Lordstown assembly plant. The programs are handled separately, except that any applicants already scored at another plant will have their old score used in the new selection process. However, applicants at a new plant must again go through the random selection process to even have their scores considered with the other applicants' scores. Plaintiff was placed in the random selection process to see if he would be one of the 100 non-seniority individuals put on the Applicant List. He was not selected for consideration at the fabrication plant;

---

3. Under this system, if only two apprenticeships are available, they both will be offered to seniority employees. Additionally, if only five apprenticeships are available, four will be offered to seniority employees and only one will be offered to a non-seniority individual. While Plaintiff makes no claims involving the favored treatment of seniority employees, it is important to note the relative number of seniority positions so as to demonstrate the limited number of slots for which Plaintiff competed.

4. Of the twelve women and minorities that were selected, not all were in positions Plaintiff had selected. Additionally, some of these 12 people had "seniority" status.

however, he remains ranked on the list at the assembly plant.

## II. STANDARD OF REVIEW

Fed.R.Civ.P. 56(c) governs summary judgment and provides, in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact, and for these purposes, the evidence submitted must be viewed in the light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

"The burden on the moving party may be discharged if the moving party demonstrates that the non-moving party has failed to establish an essential element of his or her case for which he or she bears the ultimate burden of proof at trial." *Morales v. American Honda Motor Co., Inc.,* 71 F.3d 531, 535 (6th Cir.1995). If the moving party meets this burden, then the non-moving party must present more than a scintilla of evidence in support of his or her position. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment must be granted unless there is sufficient evidence favoring the non-moving party for a judge or jury to return a verdict for that party. *Id.* at 249, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202.

## III. ANALYSIS

Defendant's motion for summary judgment raises two issues that will be discussed in turn: (A) whether Plaintiff has standing to raise a Title VII claim and (B) whether the policies and procedures of GM constitute action under color of law and should be susceptible to Fifth Amendment claims.

### A. Standing

Standing is part of the case-or-controversy requirement of Article III of the Constitution. It has three necessary elements, as explained in *Northeastern Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville:* (1) an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision. 508 U.S. 656, 663–64, 113 S.Ct. 2297, 2302, 124 L.Ed.2d 586, 595–96 (1993). Plaintiff suggests several different injuries with respect to the Lordstown assembly plant, all of which relate to PATP, and Plaintiff contends that he has not received an apprenticeship because his positions on the selection lists have been unjustly shifted since he has been excluded from PATP based on his race and sex. He presents three potential injuries.

First he argues that not receiving the apprenticeship satisfies the injury-in-fact requirement because the interest in being hired or admitted to a training program is an interest protected in certain circumstances. In *Brunet v. City of Columbus,* a case involving firefighter applicants protesting a gender-based affirmative action arrangement, the court stated that for affirmative action cases, the plaintiff must establish that, "but for the program, he would have been considered for the job, to satisfy standing requirements." 1 F.3d 390, 396 (6th Cir.1993). GM has provided ample evidence that even before affirmative action was applied Plaintiff was well below the cut-off point. Therefore, Plaintiff was not unseated from any position or consideration by affirmative action. This eliminates any causal connection between the affirmative action system Plaintiff is challenging and his injury in failing to enter the apprentice program. Thus,

he has failed to demonstrate the second and third elements of standing, i.e. causation and redress, as he would not have been given an apprenticeship even in the absence of an affirmative action program.

Plaintiff also suggests that redress for this injury could come from granting him the seven PATP bonus points that women and minorities were eligible to receive, which would elevate his score into the selection range. However, if Plaintiff's proposal were implemented, it would have to apply to all white male applicants, including all of those ahead of Plaintiff on the selection list. Once again, he would fall below the selection range. Therefore, he lacks standing to challenge GM's affirmative action plan.

■ Plaintiff also asks this Court to consider the injury caused by his ranking for future apprentice selections. He believes that future candidates who receive affirmative action considerations may unjustly supercede him as he rises toward a more favorable hiring position. He essentially argues that his standing stems from the injury that he will suffer in the future. The injury-in-fact requirement cited in *Brunet, supra,* requires that the injury be "actual or imminent, not conjectural or hypothetical." *Id.* Even if he knew that his name would be the next one selected for an apprenticeship, his injury would still not be imminent, since GM operates both its apprentice program and PATP at will and may decide to discontinue both programs at the Lordstown assembly plant. Moreover, future unadjusted applicants might perform as well as past applicants who scored higher than the Plaintiff and prevent him from entering the program regardless of the affirmative action program. With such uncertainties, Plaintiff's injury is merely conjectural, and does not grant him standing.

■ Finally, Plaintiff believes that his exclusion from PATP was itself an injury, thereby giving him standing. He relies on *University of California Regents v. Bakke,*

where a white man applied to a medical school where 16 of 100 seats were reserved for disadvantaged minority students. 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). In *Bakke,* the Supreme Court ruled that it was not necessary for Bakke to show that he would have been admitted without the barrier, because a plaintiff·has standing in such a case if he is not given the opportunity to compete for all of the available slots. *Id.* at 281, 98 S.Ct. at 2743, 57 L.Ed.2d at 765, n. 14. Since all white males are barred from participation in PATP, Plaintiff insists that he has standing under *Bakke.*

It is true that discrimination with respect to training programs is forbidden under Title VII, 42 U.S.C. § 2000e–2(d) (1994). Thus, if there is an exclusion from available seats in a training program, that would establish standing under *Bakke.* Two factors lead this Court to reject applying *Bakke* to the instant case. First, PATP is not a training program. Rather PATP is a system affording women and minorities the opportunity to earn up to seven bonus points. Applicants are selected for PATP based on how close their scores are to the selection range, not on any real measuring of skill or need for training. Also, the manner in which points are added to the applicant's Total Selection Points suggests a motive for Pre–Apprentice Training other than education. The bonus that is granted at the end of the program is a value based on performance on a test of the same nature as the original written test taken during the application process. This addition is computed in such a way that even if the applicant's score on the test decreases, his Total Selection Points increase. This suggests that the purpose of the evaluation at the end of the program is not to truly re-assess the applicant's ability, but to increase the applicant's score.

Independent of this Court's analysis of the program, Plaintiff in his own complaint does not treat PATP as training. Plaintiff's formulation of his monetary demand

suggests that admission to the apprentice program would have improved his career marketability and his subsequent salary, but he makes no similar claims about PATP. When he addresses the advantages he would have gained from PATP, he does so only in terms of addition to his Total Selection Points, not in terms of education. While this appears to be only a nominal distinction, it goes directly to the issue of redress.

If Plaintiff's interest in PATP is not based on its educational value, then his redress in terms of being allowed to participate must be from the points he can gain from Pre–Apprentice Training. Once again, there is no redress here since allowing him those points would allow all white male applicants those points, and his ranking would not be advanced.

Without demonstrating that PATP is an educational program, Plaintiff cannot show that he has been barred from participating in a program to which he is entitled. Absent such a showing, he cannot apply the *Bakke* rule. Therefore, he must still to show causation and redress relative to the apprenticeships he did not get. He has not established these elements. Consequently, Plaintiff has failed to establish standing in his Title VII claims relating to the Lordstown assembly plant.[5]

### B. Color of Law

▇▇▇ Plaintiff raises claims at both plants under the Fifth Amendment of the United States Constitution, specifically, the equal protection implied by its due process clause. Where the Fifth Amendment protects individuals from the federal government depriving them of life, liberty, or property without due process, it also protects from such intrusions by individuals acting in the place of the government. If GM was acting under color of law, then its actions can be attributed to the federal government, and it can be held to Fifth

Amendment standards. Through reasoning akin to that of the Supreme Court in *Paul v. Davis*, this Court may generally use the standards of Fourteenth Amendment equal protection cases to determine who acts under color of law for Fifth Amendment purposes. 424 U.S. 693, 702 n. 3, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).

The Defendant in this case originally implemented its affirmative action program as part of a Conciliation Agreement with the Equal Employment Opportunity Commission. That agreement terminated by its own terms in 1988, before any of the events relevant to Plaintiff's complaint occurred. Pursuant to Executive Order No. 11246, which requires government contractors to have affirmative action programs, GM continued this plan after the date of termination in compliance with the U.S. Department of Labor, Office of Federal Contract Compliance Programs. Moreover, the program is registered with the Department of Labor's Bureau of Apprentice Training. Plaintiff argues that this compliance establishes that Defendant was acting under color of law, and Defendant should, thus, be considered a federal actor subject to Fifth Amendment constraints.

Plaintiff's argument is loosely based on *Lugar v. Edmondson Oil Co.*, which recognizes action under color of law when the private individual or company is acting with the authority of the state. 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). Plaintiff also cites *Hammons v. Norfolk Southern Corp.*, where a railroad company was performing drug testing as required of all railroad companies by federal law. 156 F.3d 701 (6th Cir.1998). A railroad regulation such as the one in *Hammons* forces a company to act in an enforcement capacity for a federal law, while the Executive Order upon which GM's plan is premised is to be complied with voluntarily. *See McLaughlin v. Great Lakes Dredge &*

---

**5.** Defendant has not moved for summary judgment on Plaintiff's Title VII claim pertaining to the Lordstown fabrication plant.

*Dock Co.,* 495 F.Supp. 857 (N.D.Ohio 1980) (Defendant's implementation of a plan filed to comply with Executive Order No. 11246 was voluntary). It is unnecessary for GM to contract with the federal government, and, therefore, it is free to choose not to use or register an affirmative action system. Therefore, GM is not acting under color of law, and the Fifth Amendment claims must fail.

## IV. CONCLUSION

Because Plaintiff would not have been selected for an apprenticeship even in the absence of the affirmative action program, he lacks standing to bring a Title VII claim regarding the Lordstown assembly plant. Plaintiff has also failed to establish a prima facie case of a Fifth Amendment violation, as Defendant's affirmative action program was voluntary and, thus, not implemented under color of law. Accordingly, Defendant's Motion for Partial Summary Judgment (Dkt. No. 45) is **GRANTED.**

**IT IS SO ORDERED.**