**James B. GARNET, Sr., Plaintiff,**

v.

**GENERAL MOTORS CORPORATION, Defendant.**

**No. 4:99CV2779.**

United States District Court, N.D. Ohio.

Sept. 13, 2000.

---

Michael D. Rossi, Sr., Guarnieri & Secrest, Warren, OH, for plaintiff.

Robert S. Walker, John Q. Lewis, Jones, Day, Reavis & Pogue, Cleveland, OH, for defendant.

## MEMORANDUM OPINION AND ORDER

ECONOMUS, District Judge.

This matter is before the Court upon the Motion of the Defendant, General Motors Corporation ("General Motors"), for summary judgment (Dkt.# 15). On November 15, 1999, this case was removed by the Defendant from the Court of Common Pleas, Trumbull County, Ohio based on diversity jurisdiction. The Plaintiff, James B. Garnet, Sr. ("Garnet"), a white male, has alleged in his one count complaint that he was subject to reverse discrimination in violation of Ohio Revised Code Section 4112.02(A).

For the following reasons, the Defendant's Motion for Summary Judgment (Dkt.# 15) is **GRANTED**.

## FACTS

The only facts which the Plaintiff contests relate to the Defendant's failure to select him as a member of the 1996 Apprentice Class in the Electrician trade at the Delphi Packard Electric ("Packard") plant operations in Warren, Ohio.[1] Each party's version of the facts relevant to the 1996 Apprentice Class selection have been restated in Part C, subsection three. Otherwise, the statement of uncontested facts submitted by the Defendant, which has not been challenged, has been restated below.

### A. General Motors And The Apprentice Training Program

Pursuant to collective bargaining agreements between General Motors and the International Union IUE ("IUE"), General Motors recruited persons into its skilled trades apprentice training positions through a jointly administered local apprentice program. Affidavit of Pam Anderson ¶ 3 (*Exhibit A*, Appendix Binder). Persons seeking admission into the apprentice training program had to fill out an application listing the skilled trade groups for which they wished to be considered. Applicants then had to take a written exam covering topics such as mathematics and reading comprehension. Those applicants who scored high enough on the exam could then submit to a personal interview to discuss their career interests, prior experience and other relevant qualifications. Applicants were given an interview score by each interviewer in each skilled trade for which the applicant sought employment. The applicant's exam and interview scores were combined to form a final raw score which was used to rank applicants in the particular trades for which they applied.[2] The highest possible

---

1. Packard is now owned by Delphi Automotive Systems, Inc.

2. The term "final raw score" refers to an applicant's score without the addition of seven points for participation in the pre-apprentice training program. The Plaintiff's final raw score and total score are the same because he did not participate in pre-apprentice training.

score in any given trade was 72. Neither race nor gender were considered in the testing or interview process. Anderson Aff. ¶ 4.

Once ranked, applicants remained on an applicant list from which the company drew names to fill apprentice training positions as they became available. Each time General Motors decided to place additional persons into the apprentice training program, the testing and interview process was conducted and the scores of those new applicants were added to the applicant lists in respective rank order. The rankings of those individuals previously on the applicant list, thus, could be adjusted downward as additional applicants were added to the list. Anderson Aff. ¶ 5.

The agreed-upon selection criteria permitted non-seniority individuals (non-current General Motors employees), as well as General Motors seniority employees, to submit applications for job openings. Pursuant to the collective bargaining agreement, there were separate lists for General Motors seniority employees and for non-seniority individuals seeking a skilled trade apprentice training position. General Motors was obligated to hire applicants into its skilled trade apprentice training program at a ratio of at least two seniority employees to every non-seniority individual. Anderson Aff. ¶ 6.

### B. The Pre–Apprentice Program

After apprentice selection lists were compiled and the local apprentice committees prepared the tentative list of candidates in each trade who were most qualified by virtue of their final raw scores, the Packard plant took into account affirmative action considerations pursuant to General Motors' voluntary, collectively bargained affirmative action program and the guidelines of Executive Order 11246 and the Office of Federal Contract Compliance Programs ("OFCCP"). Occasionally the Packard plant conducted pre-apprentice training, whereby certain qualified minorities and females having competitive apprentice scores were offered an opportunity to submit to pre-apprentice testing and have seven additional points added to their final raw score. The pre-apprentice program was conducted only after the minority and female applicants had taken the apprentice test, after they had interviewed for the trades in which they were interested, and after all candidates had been preliminarily ranked on the selection lists. Anderson Aff. ¶ 7.

### C. Plaintiff's Applications To The Packard Plant

The Plaintiff is a white male and was considered "non-seniority" because he had not been employed by General Motors. He first took the apprentice test in 1989 and was interviewed for the three positions he selected in 1990. In 1992, Garnet exercised the option to take the apprentice test again. On his application he changed his preferred trades to Electrician, Pipefitter, and Tool and Die. Garnet earned a score of 37 on his apprentice test. His interview scores were 27 for Electrician, 24 for Pipefitter, and 23 for Tool and Die. Thus, his final raw scores were 64 for Electrician, 61 for Pipefitter, and 60 for Tool and Die. In 1995, the Packard plant combined several trades, including the Pipefitter trade, into a new trade designated Industrial Mechanic. In 1997, Garnet re-interviewed for the Industrial Mechanic trade and scored 27 on the interview. His final raw score for the Industrial Mechanic trade after the 1997 interview was 64. Anderson Aff. ¶¶ 8, 9.

#### 1. The 1993 Apprentice Class[3]

In 1992, a committee made up of General Motors management and the IUE local

---

**3.** Plaintiff asserts claims under O.R.C. § 4112.02, which are subject to a six-year statute of limitations. *Cosgrove v. Williamsburg of Cincinnati Management Co.*, 70 Ohio St.3d 281, 638 N.E.2d 991, 995 (1994). Plaintiff filed his complaint in October 1999, thus, any employment decisions prior to October 1993 are time-barred. The Defendant argues that since the 1993 apprentice class was placed in August 1993, any claim with regard to that class is untimely.

agreed that a class of apprentices would be recruited at the Packard plant. The committee determined that, in the Plaintiff's selected trades, 12 apprentices would be hired in the Electrician trade, six apprentices would be hired in the Pipefitter trade, and 30 apprentices would be hired in the Tool and Die trade. Under the collective bargaining agreement's seniority-to-non-seniority-ratio provisions, General Motors could hire four non-seniority apprentices in the Electrician trade, two apprentices in the Pipefitter trade, and 10 apprentices in the Tool and Die trade. Anderson Aff. ¶ 10.

After reviewing and compiling the available final raw scores of both seniority employees and non-seniority individuals, General Motors identified the top candidates in each trade. Without regard to affirmative action considerations, the Plaintiff was not ranked in the top four in the Electrician trade, was not ranked in the top two in the Pipefitter trade, and was not ranked in the top 10 in the Tool and Die trade. In the Electrician trade, eight non-seniority individuals had higher final raw scores than the Plaintiff (General Motors hired only four non-seniority individuals in that trade). In the Pipefitter trade, six non-seniority individuals had higher final raw scores than the Plaintiff (only two eventually were hired). In the Tool and Die trade, 49 non-seniority had higher final raw scores than the Plaintiff (only ten eventually were hired). The apprentice class was placed in August 1993. Garnet was not displaced from any of the positions he sought by any applicants who eventually received apprentice positions and had been awarded points for pre-apprentice training. Anderson Aff. ¶ 11, 12.

### 2. The 1995 Apprentice Class

In January 1995, the joint committee sought to place another class of apprentices. The committee determined that, regarding the Plaintiff's selected trades, 12 apprentices would be hired in the Elec-

trician trade, 24 apprentices would be hired in the Tool and Die trade, and six apprentices would be hired in the Industrial Mechanic trade.[4] Under the collective bargaining agreement's seniority-to-non-seniority-ratio provisions, General Motors could hire four non-seniority apprentices in the Electrician trade, eight non-seniority apprentices in the Tool and Die trade, and two non-seniority apprentices in the Industrial Mechanic trade. Anderson Aff. ¶ 13.

After reviewing and compiling the available final raw scores of both seniority employees and non-seniority individuals, General Motors identified the top candidates in each trade. Without regard to affirmative action considerations, the Plaintiff was not ranked in the top four in the Electrician trade, was not ranked in the top six in the Tool and Die trade, and was not ranked in the top two in the Industrial Mechanic trade. In the Electrician trade, nine non-seniority individuals had higher final raw scores than the Plaintiff (only four individuals were eventually hired). In the Tool and Die trade, 47 non-seniority individuals had higher final raw scores than the Plaintiff (only six individuals were eventually hired). In the combined Industrial Mechanic trade, 33 non-seniority individuals had higher final raw scores than the Plaintiff (only two individuals were eventually hired). This apprentice class was placed in June 1995. Once again, Garnet was not displaced from any of the positions he sought by any of the applicants who eventually received apprentice positions and had been awarded points for pre-apprentice training. Anderson Aff. ¶ 14, 15.

### 3. The 1996 Apprentice Class.

In January 1996, the joint committee sought to place another class of apprentices. The committee determined that, as to the Plaintiff's selected trades, nine apprentices would be hired in the Electrician trade, 24 apprentices would be hired in the

---

4. The Industrial Mechanic positions were considered from the combined trades of Machine Repair, Pipefitter (one of Garnet's selected trades), Millwright and Tinsmith.

Tool and Die trade, and 15 apprentices would be hired in the Industrial Mechanic trade.[5] Under the collective bargaining agreement's seniority-to-non-seniority-ratio provisions, General Motors could hire no more than three non-seniority apprentices in the Electrician trade, eight non-seniority apprentices in the Tool and Die trade, and five non-seniority apprentices in the Industrial Mechanic trade. Anderson Aff. ¶ 16.

After reviewing and compiling the available final raw scores of both seniority employees and non-seniority individuals, General Motors identified the top candidates in each trade. Without regard to affirmative action considerations, the Plaintiff was not ranked in the top two in the Electrician trade, was not ranked in the top eight in the Tool and Die trade, and was not ranked in the top five in the Industrial Mechanic trade. In the Electrician trade, four non-seniority individuals had higher final raw scores than the Plaintiff (only two individuals were eventually hired). In the Tool and Die trade, 39 non-seniority individuals had higher final raw scores than the Plaintiff (only eight individuals were eventually hired). In the combined Industrial Mechanic trade, 14 non-seniority individuals had higher final raw scores than the Plaintiff (only three individuals were eventually hired). Anderson Aff. ¶ 17.

The apprentice class was placed in June 1996. The exhibits submitted by the Plaintiff, show that three of the four individuals in the Electrician trade who had higher final raw scores than Garnet accepted positions in a different trade. One other individual declined an offer of employment altogether. The two individuals who were selected for the 1996 Apprentice Class in the Electrician trade, Torres and Bankhead, Jr. ("Bankhead"), each received a final raw score of 63. However, Torres, who is Hispanic, and Bankhead, who is an African–American, each received seven additional points because of their participation in the pre-apprentice training program, increasing their respective total scores to 70. The Plaintiff's total score was 64. The Plaintiff contends that as a result of the points received by Torres and Bankhead through the pre-apprentice training program, they were ranked higher than him for the purpose of selecting the 1996 Apprentice Class in the Electrician trade. Thus, he was displaced from a position in that class.[6] Additionally, Butcher, a white female with a final raw score of 60, was also ranked ahead of the Plaintiff because she received seven additional points for her participation in the pre-apprentice training program, giving her a total score of 67.

The Defendant notes that prior to placement of the 1996 class, 192 out of 210 (over 91%) employees working in the Electrician skilled trade were white males, 17 out of 24 Electrician apprentices (over 67 %) were white males, and 68 out of 96 total employees working as apprentices (over 70%) were white males. Anderson Aff. ¶¶ 18, 29.

### 4. The 1997 Apprentice Class

In January 1997, the joint committee sought to place another class of apprentices. The committee determined that, of the Plaintiffs selected trades, 12 apprentices would be hired in the Tool and Die trade. Under the collective bargaining agreement's seniority-to-non-seniority-ratio provisions, General Motors could hire no more than four non-seniority apprentices in the Tool and Die trade. Anderson Aff. ¶ 19.

After reviewing and compiling the available final raw scores of both seniority employees and non-seniority individuals, Gen-

---

**5.** Once again, the Industrial Mechanic positions were considered from the combined trades of Machine Repair, Pipefitter (which was one of Garnet's trades), Millwright and Tinsmith.

**6.** Garnet was not displaced from any positions in the Tool and Die or Industrial Mechanic trades by any applicants who received positions in those trades and had been awarded points for pre-apprentice training.

eral Motors identified the top candidates in the Tool and Die trade. Without regard to affirmative action considerations, the Plaintiff was not ranked among the top four applicants. In that trade, five non-seniority individuals had higher final raw scores than the Plaintiff (only four individuals were eventually hired). The 1997 apprentice class was placed in April 1998. Garnet was not displaced from any of the positions he sought by any of the applicants who received apprentice positions and had been awarded points for pre-apprentice training. Anderson Aff. ¶¶ 20, 21.

### 5. The 1998 Apprentice Class

In the interim, the joint committee sought to place another class of apprentices for 1998. The committee determined that, in the Plaintiff's selected trades, six apprentices would be hired in the Electrician trade, 12 apprentices would be hired in the Tool and Die trade, and six apprentices would be hired in the Industrial Mechanic trade. Under the collective bargaining agreement's seniority-to-non-seniority-ratio provisions, General Motors could hire no more than two non-seniority apprentices in the Electrician trade, four non-seniority apprentices in the Tool and Die trade, and two non-seniority apprentices in the Industrial Mechanic trade. Anderson Aff. ¶ 21.

After reviewing and compiling the available final raw scores of both seniority employees and non-seniority individuals, General Motors identified the top candidates in each trade. Without regard to affirmative action considerations, the Plaintiff was not ranked in the top two in the Electrician trade, was not ranked in the top four in the Tool and Die trade, and was not ranked in the top two in the Industrial Mechanic trade. In the Electrician trade, four non-seniority individuals had higher final raw scores than the Plaintiff (only two individuals were eventually hired). In the Tool and Die trade, 11 non-seniority individuals had higher final raw scores than the Plaintiff (only four individuals were eventually hired). In the combined Industrial Mechanic trade, three non-se-

niority individuals had higher final raw scores than the Plaintiff (only one individual was eventually hired). The Plaintiff was not among the top candidates in the 1998 apprentice training program, before any affirmative action. Anderson Aff. ¶ 22.

The apprentice class was placed in December 1998. Garnet was not displaced from any of the positions he sought by any of the applicants who received apprentice positions and had been awarded points for pre-apprentice training. Anderson Aff. ¶ 23.

### 6. The 1999 Apprentice Class

In January 1999, the joint committee sought to place another class of apprentices. The committee determined that, in the Plaintiff's selected trades, six apprentices would be hired in the Electrician trade, 12 apprentices would be hired in the Tool and Die trade, and six apprentices would be hired in the Industrial Mechanic trade. Under the collective bargaining agreement's seniority-to-non-seniority-ratio provisions, General Motors could hire no more than two non-seniority apprentices in the Electrician trade, four non-seniority apprentices in the Tool and Die trade, and two non-seniority apprentices in the Industrial Mechanic trade. Anderson Aff. ¶ 24.

After reviewing and compiling the available raw final scores of both seniority employees and non-seniority individuals, General Motors identified the top candidates in each trade. The Defendant asserts that without regard to affirmative action considerations, the Plaintiff was not ranked in the top two in the Electrician trade, was not ranked in the top four in the Tool and Die trade, and was not ranked in the top two in the Industrial Mechanic trade. In the Electrician trade, nine non-seniority individuals had higher final raw scores than the Plaintiff (only two individuals were eventually hired). In the Tool and Die trade, 16 non-seniority individuals had higher final raw scores than plaintiff (only four individuals were eventually hired). In

the Industrial Mechanic trade, eight non-seniority individuals had higher final raw scores than the Plaintiff (only two individuals were eventually hired). The Plaintiff was not among the top candidates in the 1999 apprentice training program, before any affirmative action. Anderson Aff. ¶ 25.

The apprentice class was placed in June 1999. Garnet was not displaced from any of the positions he sought by any of the applicants who received apprentice positions and had been awarded points for pre-apprentice training. Anderson Aff. ¶ 26.

D. *Background Circumstances At The Packard Plant*

As of February 2000, the Packard plant employed 149 persons in the skilled trades apprentice training program; of those, 115 were white males (over 77%). In the Electrician trade, 20 of 28 individuals were white males (over 71%). In the Tool and Die trade, 53 of 70 individuals were white males (over 75%). In the Pipefitter trade, five of six individuals were white males (over 83%). Anderson Aff. ¶ 27.

Since 1993, the Packard plant has hired 221 apprentices, 161 of whom were white males (over 72%). In 1993, 38 of 54 apprentices hired were white males (over 70%). In 1995, 30 of 42 apprentices hired were white males (over 71%). In 1996, 24 of 36 apprentices hired were white males (over 66%). In the 1997 class, 10 of 15 apprentices hired were white males (over 66%). In the 1998 class, 20 of 27 apprentices hired were white males (over 74%). In the 1999 class, 19 of 24 apprentices hired were white males (over 79%). Anderson Aff. ¶ 28.

**SUMMARY JUDGMENT**

Fed.R.Civ.P. 56(c) governs summary judgment and provides, in pertinent part:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the mov-

ing party is entitled to a judgment as a matter of law.

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact, and for these purposes, the evidence submitted must be viewed in the light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

"The burden on the moving party may be discharged if the moving party demonstrates that the non-moving party has failed to establish an essential element of his or her case for which he or she bears the ultimate burden of proof at trial." *Morales v. American Honda Motor Co., Inc.*, 71 F.3d 531, 535 (6th Cir.1995). If the moving party meets this burden, then the non-moving party must present additional evidence beyond the pleadings. *Id.* The non-moving party must present more than a scintilla of evidence in support of his or her position. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment must be granted unless there is sufficient evidence favoring the non-moving party for a judge or jury to return a verdict for that party. *Id.* at 249, 106 S.Ct. 2505.

**ANALYSIS**

The Defendant has asserted the following two arguments in support of its summary judgment motion: (1) the Plaintiff lacks standing to bring this case because he was not in a position to receive a job before any affirmative action occurred; and (2) the Plaintiff cannot establish a *prima facie* case of reverse discrimination.

**I. Standing**

█ Standing is part of the case-or-controversy requirement of Article III of the Constitution. It has three necessary elements, as explained in *Northeastern Fla. Chapter of the Associated Gen. Contrac-*

*tors of Am. v. City of Jacksonville* : (1) an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision. 508 U.S. 656, 663–64, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993).

■ To satisfy the first element of standing, a plaintiff must allege an injury that is "concrete and particularized ... and actual or imminent, not conjectural or hypothetical." *Kardules v. City of Columbus*, 95 F.3d 1335, 1346 (6th Cir.1996) (*citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)) (quotations omitted). Furthermore, it is well-established in the Sixth Circuit that in reverse discrimination cases, a plaintiff may satisfy standing requirements where, "but for the [affirmative action] program, he would have been considered for the job." *Brunet v. City of Columbus*, 1 F.3d 390, 397 (6th Cir.) *cert. denied Brunet v. Tucker*, 510 U.S. 1164, 114 S.Ct. 1190, 127 L.Ed.2d 540 (1994).

■ The Plaintiff has established that he suffered an injury in fact as a result of the Defendant's affirmative action program.[7] The applicants for the 1996 Apprentice Class in the Electrician trade who were ranked in the top four all declined a position in the applicant class for various reasons. The fifth and sixth ranked applicants, Torres and Bankhead, accepted. Torres and Bankhead ranked fifth and sixth respectively based, in part, on the addition of seven points to their score as a result of their participation in the pre-apprentice training program. Torres and Bankhead each had a final raw score of 63, and a total score of 70. The seventh ranked applicant, Butcher, also received seven points for her participation in the program. Butcher had a final raw score of 60, and a total score of 67. Comparatively, the Plaintiff had a total score of 64. Torres, Bankhead, and Butcher would have been ranked below the Plaintiff based on final raw scores which were not enhanced by the addition of pre-apprentice training points. Therefore, but for the addition of seven points to the scores of Torres, Bankhead, and Butcher, the Plaintiff would have been selected from the non-seniority applicant list into the 1996 Apprentice Class in the Electrician trade after the four top-ranked applicants declined the opportunity to participate.

The second standing requirement is that a causal connection exist between the alleged injury and the Defendant's challenged conduct. For a causal relationship to exist, the Plaintiff's injury must be "fairly trace[able] to the challenged action of the defendant." *Kardules*, 95 F.3d at 1346 (*citing Lujan, supra*) (quotations omitted). Based on the reasoning set forth in the preceding paragraph, the Plaintiff has established a causal connection between his injury and the Defendant's administration of its affirmative action program. There is no question that without the addition of seven pre-apprentice training points to the final raw scores of Torres, Bankhead, and Butcher, the Plaintiff would have been ranked sixth and would have been selected for the 1996 Apprentice Class. As such, after the four top-ranked individuals declined a position in the 1996 Apprentice Class for the Electrician trade, the Plaintiff would have been selected.

Finally, the harm suffered by the Plaintiff as a result of the Defendant's conduct can be redressed by this Court. Accord-

---

**7.** *Yeager v. General Motors Corp.,* 67 F.Supp.2d 796 (N.D.Ohio 1999, Economus J.), is distinguishable from the case *sub judice* on its facts. In *Yeager,* the plaintiff could not establish that the pre-apprentice training program caused him not to be selected as an apprentice. *Id.* at 800–801. This Court found that General Motors "provided ample evidence that even before affirmative action was applied Plaintiff was well-below the cut-off point" for selection into the apprentice training program. *Id.* at 800. In the present case, Garnet was actually bumped several rankings by individuals who received pre-apprentice training points and otherwise would not have been ranked higher than him on the applicant list for the Electrician trade in 1996.

ingly, the Plaintiff has standing to bring this lawsuit.

## II. Reverse Discrimination

Despite the Plaintiff's standing to bring this cause of action, he has not established a *prima facie* case of reverse discrimination.[8] The Plaintiff alleges that General Motors discriminated against him by treating him differently than other similarly situated employees because he is white, in violation of Ohio Revised Code § 4112.02(A). In the absence of direct evidence, to establish a *prima facie* case of discrimination, plaintiffs must use the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[9] *McDonnell* requires a complainant to carry the initial burden of proving a *prima facie* discrimination case by demonstrating:

(1) that he belongs to a racial minority;

(2) that he applied and qualified for a job for which the employer was seeking applicants;

(3) that despite his qualifications, he was rejected; and

(4) that after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

411 U.S. at 802, 93 S.Ct. 1817.

■ In the reverse employment discrimination context, the *McDonnell* standard has been modified to contemplate plaintiffs that are members of a dominant group or majority.[10] Plaintiffs may establish a *prima facie* case for reverse discrimination by showing: (1) background circumstances to support the suspicion that "the defendant is that unusual employer who discriminates against the majority;" and (2) "the employer treated similarly situated employees who were not members of a protected group, more favorably." *Pierce*, 40 F.3d at 801. *See also Jasany v. United States Postal Service*, 755 F.2d 1244, 1248 (6th Cir.1985). Where a *prima facie* case of discrimination has been demonstrated, the employer must then produce evidence of legitimate, nondiscriminatory reasons for its action. *See McDonnell, supra; see also Ang v. Procter & Gamble Co.*, 932 F.2d 540, 548 (6th Cir.1991). If the employer is able to rebut the plaintiff's *prima facie* case, the burden is on the plaintiff to discredit the employer by showing the proffered reasons were pretextual. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Ang v. Procter & Gamble Co.*, 932 F.2d at 548.

■ The Plaintiff cannot establish that "the defendant is that unusual employer who discriminates against the majority." *Pierce*, 40 F.3d at 801. The overwhelming and undisputed statistical evidence offered by the Defendant clearly establishes that the Defendant employs substantially more white males than women or racial minorities. The Plaintiff has chosen not to challenge the Defendant's statistical evidence, but rather states in a single conclusory statement in his Response to the Defendant's summary judgment motion that "[the pre-apprentice training program's] very premise is that of 'discriminating against the majority.'" (Response at 3.) The Plaintiff cites to pages A–875 through

---

**8.** The Plaintiff has chosen to respond to Defendant's argument that he has not established a *prima facie* case of reverse discrimination in a single sentence.

**9.** The Supreme Court of Ohio has adopted the *McDonnell* standard in dealing with discrimination claims. *See Mitchell v. Toledo Hospital*, 964 F.2d 577, 582 (6th Cir.1992); *see also Plumbers & Steamfitters Joint Apprenticeship Committee v. Ohio Civil Rights Commission*, 421 N.E.2d 128, 131–32, 66 Ohio St.2d 192 (1981).

**10.** The Sixth Circuit, following the Supreme Court's directive, has held that "the ... [McDonnell] standard should be modified to accommodate different employment contexts." *Pierce v. Commonwealth Life Insurance Co.*, 40 F.3d 796, 801 (6th Cir.1994); *Murray v. Thistledown Racing Club. Inc.*, 770 F.2d 63, 67 (6th Cir.1985) (*quoting McDonnell*, 411 U.S. at 802 n. 13, 93 S.Ct. 1817.)

A–880 of Attachment 3 to the Defendants summary judgment motion in support of this statement. Attachment 3 is a copy of the General Motors–United Auto Workers "Standard Apprentice Plan." The Court has reviewed the pages cited by the Plaintiff, in detail, along with the rest of the plan and the other attachments submitted in connection with the Defendant's summary judgment program, and does not find any proof that General Motors discriminates against white males. Merely administering a program which affords women and minorities greater opportunities to obtain positions in a workforce that is dominated by white males does not rise to the level of intentional discrimination against the majority. As such, the Plaintiff cannot establish the elements of a *prima facie* case of reverse discrimination and the Defendant is entitled to summary judgment.

## CONCLUSION

Although the Plaintiff has demonstrated that he does have standing to bring this lawsuit, he cannot establish the requisite elements of a *prima facie* case of reverse discrimination. Accordingly, the Defendant's Motion for Summary Judgment (Dkt.# 15) is **GRANTED.**

**IT IS SO ORDERED.**